1  CASPER J. RANKIN (SBN 249196)
   JARED D. BISSELL (SBN 272687)
2  ERIC J. TESTAN (SBN 268919)
   PITE DUNCAN, LLP
3  4375 Jutland Drive, Suite 200
   P.O. Box 17933
4  San Diego, CA 92177-0933
   Telephone: (858) 750-7600
5  Facsimile: (619) 590-1385

6  Attorneys for  BANK  OF  AMERICA,  NATIONAL  ASSOCIATION  SUCCESSOR  BY
                  MERGER TO LASALLE BANK NA AS TRUSTEE FOR WAMU MORTGAGE
7                 PASS-THROUGH CERTIFICATES SERIES 2007-HY2 TRUST

8

9                  UNITED STATES BANKRUPTCY COURT

10     CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO VALLEY DIVISION

11  | In re | Case No. 1:11-bk-13877-MT |
    |---|---|
12  | MICHAEL R. KLOCK , | Chapter 13 |
13  | | OBJECTION TO CONFIRMATION OF CHAPTER 13 PLAN |
14  | Debtor. | |
15  | | 341(a) MEETING: |
    | | DATE:     May 11, 2011 |
16  | | TIME:     10:00 AM |
    | | PLACE:    105, 21051 Warner Center Lane, Woodland Hills, CA 91367 |
17  | | |
18  | | CONFIRMATION HEARING: |
    | | DATE:     June 14, 2011 |
19  | | TIME:     9:30 AM |
    | | CTRM:     302, 21041 Burbank Blvd, Woodland Hills, CA 91367 |
20

21

22      Bank of America, National Association successor by merger to LaSalle Bank NA as trustee

23  for WaMu Mortgage Pass-Through Certificates Series 2007-HY2 Trust[1] (hereinafter "Bank of

24  America"), secured creditor of the above-entitled Debtor, Michael R. Klock (hereinafter "Debtor"),

25  hereby objects to the Chapter 13 Plan filed by Debtor in the above-referenced matter. The basis of

26  the objection is stated below:

27  _____

28      [1] This Objection to Confirmation of Chapter 13 Plan shall not constitute a waiver of the within party's right to receive service pursuant to Fed. R. Civ. P. 4, made applicable to this proceeding by Fed. R. Bankr. P. 7004, notwithstanding Pite Duncan, LLP's participation in this proceeding. Moreover, the within party does not authorize Pite Duncan, LLP, either expressly or impliedly through Pite Duncan, LLP's participation in this proceeding, to act as its agent for purposes of service under Fed. R. Bankr. P. 7004.

# I.

## **STATEMENT OF FACTS**

1.        On or about November 30, 2005, Debtor, for valuable consideration, made, executed and delivered to Washington Mutual Bank, F.A. (hereinafter "WaMu") a Promissory Note in the principal sum of $787,500.00 (the "Note"). Pursuant to the Note, Debtor is obligated to make monthly principal and interest payments. A copy of the Note is attached hereto as exhibit A and incorporated herein by reference.

2.        On or about November 30, 2005, Debtor made, executed and delivered to WaMu a Deed of Trust (the "Deed of Trust") granting WaMu a security interest in certain real property located at 20544 Cheney Drive, Topanga, California 90290 (hereinafter the "Subject Property"), which is more fully described in the Deed of Trust. The Deed of Trust was recorded on December 8, 2005, in the official records of the Los Angeles County Recorder's office. A copy of the Deed of Trust is attached hereto as exhibit B and incorporated herein by reference. Thereafter, Debtor defaulted with payments under the Note and is contractually due for May 2010.

3.        Bank of America currently owns the Note and is entitled to enforce the provisions of the Note and Deed of Trust. Bank of America qualifies as the Note holder with standing to prosecute the instant objection as WaMu indorsed the Note in blank, thereby converting the Note to a bearer instrument and Bank of America is currently in rightful possession of the indorsed in blank Note.

4.        On or about March 30, 2011, Debtor filed a Chapter 13 bankruptcy petition. Debtor's Chapter 13 Plan provides no provision for payment to the Chapter 13 Trustee, nor does Debtor indicate the term of the Plan. Moreover, Debtor's Chapter 13 Plan contains no provision for payment to Bank of America on its pre-petition arrears.

5.        The pre-petition arrearage on Bank of America's secured claim is in the sum of $54,211.84. A copy of Bank of America's Proof of Claim is attached hereto as exhibit C and incorporated herein by reference.

6.        Debtor will have to increase the payment through the Chapter 13 Plan to Bank of America to approximately $1,505.88 monthly in order to cure Bank of America's pre-petition arrears over a period not to exceed thirty-six (36) months, or $903.53 monthly not to exceed sixty (60)

1  months.

2  Bank of America now objects to the Chapter 13 Plan filed herein by Debtor.

3  **II.**

4  **ARGUMENT**

5  Application of the provisions of 11 United States Code § 1325 determines when a plan shall

6  be confirmed by the Court. Based on the above sections, as more fully detailed below, this Plan

7  cannot be confirmed as proposed.

8  **A.    DOES NOT MEET FULL VALUE REQUIREMENT**
9  11 U.S.C. § 1325(a)(5)(B)(ii).

10  The amount of arrearage in Debtor's Chapter 13 Plan is incorrect. The pre-petition arrears

11  specified in the Chapter 13 Plan are $0.00. The actual pre-petition arrears equal $54,211.84, based

12  on Bank of America's Proof of Claim. As a result, the Plan fails to satisfy 11 U.S.C. §

13  1325(a)(5)(B)(ii).

14  **B.    PROMPT CURE OF PRE-PETITION ARREARS**
15  11 U.S.C. § 1322(d).

16  Debtor will have to increase the payment through the Chapter 13 Plan to Bank of America to

17  approximately $1,505.88 monthly in order to cure Bank of America's pre-petition arrears over a

18  period not to exceed thirty-six (36) months, or $903.53 monthly not to exceed sixty (60) months.

19  **C.    FEASIBILITY**
20  11 U.S.C. § 1325(a)(6); 11 U.S.C. § 1322(d).

21  Debtor's Schedule J indicates that Debtor has disposable income of <$2,271.00>. However,

22  Debtor will be required to apply either $1,505.88 monthly for thirty-six (36) month or $903.43

23  monthly for sixty (60) to the Chapter 13 Plan in order to provide for a prompt cure of Bank of

24  America's pre-petition arrears. Debtor lacks sufficient monthly disposable income with which to

25  fund this Plan.

26

27  WHEREFORE, Bank of America respectfully requests:

28  1.    That confirmation of Debtor's Chapter 13 Plan be denied;

2.    That Debtor's case be dismissed;

1

2      3.      Alternatively, that the Plan be amended to reflect that the pre-petition arrears listed in

3  Bank of America's Proof of Claim be paid within a period not exceeding sixty (60) months; and

4      4.      Alternatively, that the Plan be amended to reflect that Bank of America maintains a

5  fully secured claim which is subject to an Adequate Protection Order requiring Debtor to maintain

6  current Plan payments to the Chapter 13 Trustee; and

7      5.      For such other and further relief as this Court deems just and proper.

8                                        Respectfully submitted,

9
Dated: May 5, 2011                       PITE DUNCAN, LLP
10

11
                                         /s/ Jared D. Bissell
12                                       JARED D. BISSELL
                                         Attorneys for BANK OF AMERICA, NATIONAL
13                                       ASSOCIATION SUCCESSOR BY MERGER TO
                                         LASALLE BANK NA AS TRUSTEE FOR WAMU
14                                       MORTGAGE PASS-THROUGH CERTIFICATES
                                         SERIES 2007-HY2 TRUST
15

16

17

18

19

20

21

22

23

24

25

26

27

28

| In re:<br>MICHAEL R. KLOCK<br><br>Debtor(s). | CHAPTER 13<br><br>CASE NUMBER 1:11-BK-13877-MT |
| --- | --- |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

4375 Jutland Drive, Suite 200
P.O. Box 17933
San Diego, CA 92177-0933

A true and correct copy of the foregoing document described <u>Objection to Confirmation of Debtor's Chapter 13 Plan</u> will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On  May 5, 2011  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

> U.S. Trustee served pursuant to Local Bankruptcy Rule 2002-2(a) (2)

☐ Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On  May 5, 2011  I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

Honorable Maureen Tighe
U.S. Bankruptcy Court
21041 Burbank Blvd., Suite 325
Woodland Hills, CA 91367-6606

Michael R. Klock
20544 Cheney Drive
Topanga, CA 90290

Gary L. Harre
Global Capital Law PC
8700 Warner Ave Ste 200
Fountain Valley, CA 92708

Elizabeth (SV) F Rojas (TR)
Noble Professional Center
15060 Ventura Blvd., Suite 240
Sherman Oaks, CA 91403

☐ Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 5, 2011 | Megan Zerga | /s/ MEGAN ZERGA |
| --- | --- | --- |
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2009*

**F 9013-3.1**

# FIXED/ADJUSTABLE RATE NOTE
## (1 Year Treasury Index - Rate Caps)

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

___November 30, 2005___          ___WEST HILLS___ ___ ___California___
                                         (City)                          (State)

20544 CHENEY DRIVE, TOPANGA, CA 90290                                          _
                              (Property Address)

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ _787,500.00_ (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is ___Washington Mutual Bank, FA___ . I will make all payments under this Note in the form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of __5.275__ %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay Principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on February 1st, 2006 , I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on January 1st, 2036 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at ___LOAN SERVICE, 9451 CORBIN AVE,___ ___NORTHRIDGE, CA 91324___ or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ _4,730.70_ . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid Principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

4610 (03-01)                              Page 1 of 6

EXHIBIT A

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of ___January, 2011___, and on that day every 12th month thereafter. Each date on which my adjustable interest rate could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of 1 year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding ___Two & Sixty-Five-Hundredths___ percentage points ( _2.650_ %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than _10.275_ % or less than _2.650_ %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two percentage points (2.0%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than _10.275_ %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notices of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### (G) Failure to Make Adjustments

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder



in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**Miscellaneous Fees:** I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $ _15.00_ . Lender reserves the right to change the fee from time to time without notice except as may be required by law.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of _Fifteen_ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be _5.000_ % of my overdue payment of Principal and interest. I will pay this late charge promptly, but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

4610 (03-01)                    Page 3 of 6

EXHIBIT A

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**(A) UNTIL MY INITIAL FIXED INTEREST RATE CHANGES TO AN ADJUSTABLE INTEREST RATE UNDER THE TERM STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL READ AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in

accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) WHEN MY INITIAL FIXED INTEREST RATE CHANGES TO AN ADJUSTABLE INTEREST RATE UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT AS DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD READ AS FOLLOWS:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

X _____
MICHAEL KLOCK

Pay to the order of

Without Recourse
Washington Mutual Bank, FA

Cynthia A. Riley, Vice President

# ADDENDUM TO FIXED/ADJUSTABLE RATE NOTE

This Addendum to Fixed/Adjustable Rate Note is made this 30th day of November, 2005
and is incorporated into and shall be deemed to amend and supplement the Fixed/Adjustable Rate
Note (the "Note") of the same date given by the undersigned (the "Borrower") and made payable to
the order of _____ Washington Mutual Bank, FA _____ ("Lender").

Paragraph 3 of the Note is hereby restated in its entirety as follows:

**3. PAYMENTS**

   **(A) Time and Place of Payments**
   I will make my monthly payments on the first day of each month beginning on
   February, 2006 . Until the first day of _____ February, 2011 _____ I will pay only the
   interest on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by
   making payments every month as provided below.
   I will make these payments every month until I have paid all of the Principal and interest and any
   other charges described below that I may owe under this Note. Each monthly payment will be
   applied as of its scheduled due date and will be applied to interest before Principal. If, on
   January 1, 2036 , I still owe amounts under this Note, I will pay those amounts in full on
   that date, which is called the "Maturity Date".
   I will make my monthly payments at LOAN SERVICE, 9451 CORBIN AVE, NORTHRIDGE,
   CA 91324 or at a different place if required by the Note Holder.
   **(B) Amount of My Initial Monthly Payments**
   Each of my initial monthly interest-only payments will be in the amount of U.S.
   $ 3,461.72 . This amount may change.
   **(C) Monthly Payment Changes**
   Changes in my monthly payment will reflect changes in the unpaid Principal of my loan and in
   the interest rate that I must pay. The Note Holder will determine my new interest rate and the
   changed amount of my monthly payment in accordance with Section 4 of this Note.
   Notwithstanding any other provision herein, the interest-only payment identified above shall be
   based upon the unpaid Principal balance after any partial prepayment is made.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

x _____
MICHAEL KLOCK

30044 (07-01)

12                              EXHIBIT A

12/8/05

$S\nu T$

AFTER RECORDING RETURN TO:

Washington Mutual Bank, FA
C/O ACS IMAGE SOLUTIONS
12691 PALA DRIVE MS156DPCA
GARDEN GROVE, CA 92841

05 3005083

# SECURITY INSTRUMENT COVER SHEET

50041530

| Please print or type information |
|---|
| Document Title(s) (or transactions contained therein): |
| 1. Deed of Trust |

| Grantor/Trustor/Mortgagor(s) (Last name first, then first name and initials) |
|---|
| 1. MICHAEL KLOCK |
| 2. |
| 3. |
| 4. |
| 5. ☐  Additional names on page _____ of document. |

| Grantee/Beneficiary/Mortgagee(s) |
|---|
| 1. Washington Mutual Bank, FA |

| Legal Description (abbreviated: i.e. lot, block, plat or section, township, range) |
|---|
| LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF |
| |
| ☐  Additional legal is on page _____ of document. |

| Assessor's Property Tax Parcel/Account Number(s) | |
|---|---|
| 1. 4441-4-3 | 2. |
| 3. | 4. |

| This document prepared by: |
|---|
| RAFAL ZLAK |
| 8954 RIO SAN DIEGO  STE 304 |
| SAN DIEGO, CA 92108 |

2636 (12-00)

EXHIBIT B

*12/8/05*

*SUT*

*(3*

AFTER RECORDING RETURN TO:

Washington Mutual Bank, FA
C/O ACS IMAGE SOLUTIONS
12691 PALA DRIVE MS156DPCA
GARDEN GROVE, CA 92841


ORIGINAL DEED

*50041530*
*4941-4-3*

——— [Space Above This Line For Recording Data] ———

SECURITY UNION TITLE 50041530

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated _____November 30, 2005_____ , together with all Riders to this document.
**(B) "Borrower"** is MICHAEL KLOCK, AN UNMARRIED MAN

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is _____Washington Mutual Bank, FA, a federal association_____.
Lender is a _____Bank_____ organized and existing under the laws of _____United States of America_____. Lender's address is _____400 East Main Street Stockton, CA 95290_____.
Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is _____CALIFORNIA RECONVEYANCE COMPANY_____.
**(E) "Note"** means the promissory note signed by Borrower and dated _____November 30, 2005_____.
The Note states that Borrower owes Lender _____Seven Hundred Eighty-Seven Thousand Five Hundred & 00/100_____

Dollars (U.S. $ _____787,500.00_____ ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than _____January 1, 2036_____.
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

CALIFORNIA
32838 (05-01)

Page 1 of 17

05 3005083

EXHIBIT B

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[x] Adjustable Rate Rider    [ ] Condominium Rider    [ ] 1-4 Family Rider
[ ] Graduated Payment Rider    [ ] Planned Unit Development Rider    [ ] Biweekly Payment Rider
[ ] Balloon Rider    [ ] Rate Improvement Rider    [ ] Second Home Rider
[ ] Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds, whether by way of judgment, settlement or otherwise, paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably

05 3005083

15                              EXHIBIT B

grants and conveys to Trustee, in trust, with power of sale, the following described property located in   Los Angeles                          County, California:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

which currently has the address of  20544 CHENEY DRIVE                                   ,
                                                                [Street]

                TOPANGA            , California     90290      ("Property Address"):
                  [City]                            [Zip Code]

      TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

      BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

      THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

      UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
      1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one of more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
      Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic

05 3005083

16                                                        EXHIBIT B

Payment is applied as of its scheduled due date, then Lender need no funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance of the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke

05  3005083

EXHIBIT B

the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

05 3005083
18                          EXHIBIT B

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Lender may purchase such insurance from or through any company acceptable to Lender including, without limitation, an affiliate of Lender, and Borrower acknowledges and agrees that Lender's affiliate may receive consideration for such purchase. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such polices shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

Borrower hereby absolutely and irrevocably assigns to Lender all of Borrower's right, title and interest in and to all proceeds from any insurance policy (whether or not the insurance policy was required by Lender) that are due, paid or payable with respect to any damage to such property, regardless of whether the insurance policy is established before, on or after the date of this Security Instrument. By absolutely and irrevocably assigning to Lender all of Borrower's rights to receive any and all proceeds from any insurance policy, Borrower hereby waives, to the full extent allowed by law, all of Borrower's rights to receive any and all of such insurance proceeds.

Borrower hereby absolutely and irrevocably assigns to Lender all of Borrower's right, title and interest in and to (a) any and all claims, present and future, known or unknown, absolute or contingent, (b) any and all causes of action, (c) any and all judgments and settlements (whether through litigation, mediation, arbitration or otherwise), (d) any and all funds sought against or from any party or parties whosoever, and (e) any and all funds received or receivable in

05  3005083

19                              EXHIBIT B

connection with any damage to such property, resulting from any cause or causes whatsoever, including but not limited to, land subsidence, landslide, windstorm, earthquake, fire, flood or any other cause.

Borrower agrees to execute, acknowledge if requested, and deliver to Lender, and/or upon notice from Lender shall request any insurance agency or company that has issued any insurance policy to execute and deliver to Lender, any additional instruments or documents requested by Lender from time to time to evidence Borrower's absolute and irrevocable assignments set forth in this paragraph.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, or remove or demolish any building thereon, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in good condition and repair in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property in good and workmanlike manner if damaged to avoid further

05  3005083

20                                                            EXHIBIT B

deterioration or damage. Lender shall, unless otherwise agreed in writing between Lender and Borrower, have the right to hold insurance or condemnation proceeds. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause. Lender does not make any warranty or representation regarding, and assumes no responsibility for, the work done on the Property, and Borrower shall not have any right to rely in any way on any inspection(s) by or for Lender or its agent. Borrower shall be solely responsible for determining that the work is done in a good, thorough, efficient and workmanlike manner in accordance with all applicable laws.

Borrower shall (a) appear in and defend any action or proceeding purporting to affect the security hereof, the Property or the rights or powers of Lender or Trustee; (b) at Lender's option, assign to Lender, to the extent of Lender's interest, any claims, demands, or causes of action of any kind, and any award, court judgement, or proceeds of settlement of any such claim, demand or cause of action of any kind which Borrower now has or may hereafter acquire arising out of or relating to any interest in the acquisition or ownership of the Property. Lender and Trustee shall not have any duty to prosecute any such claim, demand or cause of action. Without limiting the foregoing, any such claim, demand or cause of action arising out of or relating to any interest in the acquisition or ownership of the Property may include (i) any such injury or damage to the Property including without limit injury or damage to any structure or improvement situated thereon, (ii) or any claim or cause of action in favor of Borrower which arises out of the transaction financed in whole or in part by the making of the loan secured hereby, (iii) any claim or cause of action in favor of Borrower (except for bodily injury) which arises as a result of any negligent or improper construction, installation or repair of the Property including without limit, any surface or subsurface thereof, or of any building or structure thereon or (iv) any proceeds of insurance, whether or not required by Lender, payable as a result of any damage to or otherwise relating to the Property or any interest therein. Lender may apply, use or release such monies so received by it in the same manner as provided in Paragraph 5 for the proceeds of insurance.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting



**05  3005083**

**EXHIBIT B**

and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage

05  3005083

22                              EXHIBIT B

insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is

05  3005083

23                                    EXHIBIT B

less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgement, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgement, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** This Security Instrument cannot be changed or modified except as otherwise provided herein or by agreement in writing signed by Borrower, or any Successor in interest to Borrower and Lender. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successor in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.  No waiver by Lender of any right under this Security Instrument shall be effective unless in writing. Waiver by Lender of any right granted to Lender under this Security Instrument or of any provision of this Security Instrument as to any transaction or occurrence shall not be deemed a waiver as to any future transaction or occurrence.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by

05  3005083

24                                EXHIBIT B

Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Borrower shall pay such other charges as Lender may deem reasonable for services rendered by Lender and furnished at the request of Borrower, any Successor in interest to Borrower or any agent of Borrower. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note.) Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the

CALIFORNIA
32838 (05-01)

05  3005083

EXHIBIT B

conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgement enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument,

**05 3005083**
EXHIBIT B

and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substance in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use, or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

05  3005083

EXHIBIT B

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. If Borrower or any successor in interest to Borrower files (or has filed against Borrower or any successor in interest to Borrower) a bankruptcy petition under Title II or any successor title of the United States Code which provides for the curing of prepetition default due on the Note, interest at a rate determined by the Court shall be paid to Lender on post-petition arrears.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the of the occurrence of and event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender or the Trustee (whether or not the Trustee is affiliated with Lender) may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution. Trustee may destroy the Note and the Security Instrument three (3) years after issuance of a full reconveyance or release (unless directed in such request to retain them).

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

X _____

MICHAEL KLOCK

05 3005083

EXHIBIT B

────────────────  (Space Below This Line For Acknowledgment)  ────────────────

State of CALIFORNIA                    )
                                       ) SS.
County of  Los Angeles                 )

On ___December 2, 2005_____ , before me,  __Jane Savich_____

_____ , a Notary Public in and for the State of

California, personally appeared  __Michael Klock_____

_____

_____

personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.

Witness my hand and official seal

Signature _____
Notary Public in and for the State of California

JANE SAVICH
Commission # 1607352
Notary Public - California
Los Angeles County
My Comm. Expires Oct 15, 2009

05 3005083

30                                                          EXHIBIT B



# DESCRIPTION



THAT PORTION OF LOT 7 OF TRACT NO. 3729 IN THE COUNTY OF LOS ANGELES, STATE OF
CALIFORNIA, AS PER MAP RECORDED IN BOOK 41 PAGE(S) 17 THROUGH 20 INCLUSIVE OF MAPS, IN
THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS BEGINNING AT THE
MOST WESTERLY CORNER OF SAID LOT 7, WHICH IS MARKED BY A 2 INCH IRON PIPE, THENCE
FOLLOWING THE NORTHERLY LINE OF SAID LOT NORTH 32 DEGREES 41 MINUTES 20 SECONDS EAST A
DISTANCE OF 247 63 FEET TO A 2 INCH IRON PIPE, WHICH MARKS THE BEGINNING OF A CURVE
CONCAVE TO THE SOUTHEAST AND HAVING A RADIUS OF 25 FEET, THENCE NORTHEASTERLY ALONG SAID
CURVE THROUGH A DELTA OF 33 DEGREES 20 MINUTES A DISTANCE OF 14 54 FEET TO THE END OF
SAID CURVE, WHICH POINT IS MARKED BY A 2 INCH PIPE, THENCE NORTH 66 DEGREES 1 MINUTE 20
SECONDS EAST A DISTANCE OF 24.24 FEET TO A 2 INCH IRON PIPE, WHICH MARKS A POINT IN THE
NORTHERLY LINE OF SAID LOT 7 AND IS THE TRUE POINT OF BEGINNING THENCE CONTINUING ALONG
SAID NORTHERLY LINE OF SAID LOT 7 FROM SAID TRUE POINT OF BEGINNING NORTH 66 DEGREES 1
MINUTE 20 SECONDS EAST A DISTANCE OF 314 72 FEET TO A 2 INCH IRON PIPE WHICH MARKS THE
BEGINNING OF A CURVE CONCAVE TO THE SOUTHWEST AND HAVING A RADIUS OF 32 14 FEET, THENCE
SOUTHEASTERLY ALONG SAID CURVE THROUGH A DELTA OF 109 DEGREES 2 MINUTES A DISTANCE OF
61.33 FEET TO THE END OF SAID CURVE, WHICH POINT IS MARKED BY A 2 INCH PIPE, THENCE
FOLLOWING THE EASTERLY LINE OF SAID LOT 7 SOUTH 4 DEGREES 38 MINUTES 40 SECONDS EAST A
DISTANCE OF 250 FEET TO A 2 INCH IRON PIPE WHICH MARKS AN ANGLE POINT IN SAID LOT LINE,
THENCE SOUTH 39 DEGREES 36 MINUTES EAST A DISTANCE OF 172 02 FEET TO A 2 INCH IRON PIPE
WHICH MARKS AN ANGLE POINT IN SAID LOT LINE, THENCE SOUTH 8 DEGREES 21 MINUTES 30 SECONDS
EAST A DISTANCE OF 136.66 FEET TO A 2 INCH PIPE WHICH MARKS A POINT IN THE EASTERLY LINE
OF SAID LOT 7, THENCE LEAVING SAID EASTERLY LINE SOUTH 60 DEGREES 48 MINUTES 20 SECONDS
WEST A DISTANCE OF 299 85 FEET TO A 2 INCH IRON PIPE, THENCE NORTH 42 DEGREES 25 MINUTES
40 SECONDS WEST A DISTANCE OF 94 50 FEET TO A 2 INCH IRON PIPE,THENCE NORTH 17 DEGREES 40
MINUTES EAST A DISTANCE OF 146 50 FEET TO A 2 INCH IRON PIPE, THENCE NORTH 29 DEGREES 43
MINUTES 20 SECONDS WEST A DISTANCE OF 406 20 FEET TO THE TRUE POINT OF BEGINNING EXCEPT
THEREFROM THAT PORTION OF LOT 7 DESCRIBED AS FOLLOWS. COMMENCING AT THE MOST WESTERLY
CORNER OF SAID LOT 7, WHICH POINT IS MARKED BY A 2 INCH IRON PIPE, THENCE FOLLOWING THE
NORTHERLY LINE OF SAID LOT, NORTH 32 DEGREES 41 MINUTES 20 SECONDS EAST A DISTANCE OF
247.63 FEET TO A 2 INCH IRON PIPE, WHICH MARKS THE BEGINNING OF A CURVE CONCAVE TO THE
SOUTHEAST AND HAVING A RADIUS OF 25 FEET, THENCE NORTHEASTERLY ALONG SAID CURVE THROUGH
AN ANGLE OF 33 DEGREES 20 MINUTES 0 SECONDS A DISTANCE OF 14.54 FEET TO THE END OF SAID
CURVE, WHICH POINT IS MARKED BY A 2 INCH IRON PIPE, THENCE ALONG SAID NORTHERLY LINE
NORTH 66 DEGREES 1 MINUTE 20 SECONDS EAST 24 24 FEET TO A 2 INCH IRON PIPE IN SAID
NORTHERLY LINE, THENCE LEAVING SAID NORTHERLY LINE SOUTH 29 DEGREES 43 MINUTES 20 SECONDS
EAST 406 20 FEET TO A 2 INCH IRON PIPE BEING THE TRUE POINT OF BEGINNING, THENCE NORTH 29
DEGREES 43 MINUTES 20 SECONDS WEST 223 20 FEET TO A POINT DISTANT SOUTH 29 DEGREES 43
MINUTES 20 SECONDS EAST 18 300 FEET FROM SAID LAST MENTIONED 2 INCH IRON PIPE ON THE
NORTHEASTERLY LINE OF SAID LOT 7; THENCE AT RIGHT ANGLES TO SAID LAST COURSE, NORTH 60
DEGREES 16 MINUTES 40 SECONDS EAST 289 47 FEET TO A POINT IN THE EASTERLY LINE OF SAID
LOT 7 SAID POINT BEING DISTANT SOUTH 4 DEGREES 38 MINUTES 40 SECONDS EAST 116 91 FEET
FROM A 2 INCH IRON PIPE WHICH MARKS THE SOUTHERLY TERMINUS OF THAT CERTAIN CURVE IN THE
BOUNDARY LINE OF SAID LOT, SHOWN ON SAID MAP AS BEING CONCAVE TO THE SOUTHWEST HAVING A
RADIUS OF 32.14 FEET AND A DELTA OF 109 DEGREES 20 MINUTES 0 SECONDS, THENCE ALONG THE
EASTERLY LINE OF SAID LOT, SOUTH 4 DEGREES 38 MINUTES 40 SECONDS EAST 133.09 FEET TO A 2
INCH IRON PIPE WHICH MARKS AN ANGLE POINT IN THE EASTERLY LINE OF SAID LOT, THENCE
CONTINUING ALONG SAID EASTERLY LINE SOUTH 39 DEGREES 36 MINUTES 0 SECONDS EAST 154 20
FEET, THENCE SOUTH 71 DEGREES 1 MINUTE 30 SECONDS WEST 26415 FEET TO THE TRUE POINT OF
BEGINNING. ALSO EXCEPT THAT PORTION OF LOT 7 DESCRIBED AS FOLLOWS BEGINNING AT THE MOST
WESTERLY CORNER OF SAID LOT 7, WHICH POINT IS MARKED BY A 2 INCH IRON PIPE, THENCE

05 3005083    EXHIBIT B

Page  2



# DESCRIPTION

FOLLOWING THE NORTHERLY LINE OF SAID LOT, NORTH 32 DEGREES 41 MINUTES 20 SECONDS EAST A
DISTANCE OF 24763 FEET TO A 2 INCH IRON PIPE WHICH MARKS THE BEGINNING OF A CURVE CONCAVE
TO THE SOUTHEAST HAVING A RADIUS OF 25 FEET, THENCE NORTHEASTERLY ALONG SAID CURVE
THROUGH A DELTA OF 33 DEGREES 20 MINUTES A DISTANCE OF 14.54 FEET TO THE END OF SAID
CURVE WHICH POINT IS MARKED BY A 2 INCH IRON PIPE, THENCE NORTH 66 DEGREES 01 MINUTES 20
SECONDS EAST, A DISTANCE OF 2424 FEET TO A 2 INCH IRON PIPE WHICH MARKS A POINT IN THE
NORTHERLY LINE OF SAID LOT 7 AND IS THE TRUE POINT OF BEGINNING, THENCE LEAVING SAID
NORTHERLY LINE, SOUTH 29 DEGREES 43 MINUTES 20 SECONDS EAST 18300 FEET, THENCE AT RIGHT
ANGLES TO SAID LAST COURSE, NORTH 60 DEGREES 16 MINUTES 40 SECONDS EAST 28947 FEET TO A
POINT IN THE EASTERLY LINE OF SAID LOT 7, SAID POINT BEING DISTANT SOUTH 4 DEGREES 38
MINUTES 40 SECONDS EAST 116 91 FEET FROM A 2 INCH IRON PIPE WHICH MARKS THE SOUTHERLY
TERMINUS OF THAT CERTAIN CURVE IN THE BOUNDARY LINE OF SAID LOT, SHOWN ON SAID
LASTMENTIONED MAP AS BEING CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 32 14 FEET AND A
DELTA OP 109 DEGREES 20 MINUTES, THENCE ALONG THE EASTERLY LINE OF SAID LOT, NORTH 4
DEGREES 38 MINUTES 40 SECONDS WEST 116 91 FEET TO SAID 2 INCH IRON PIPE, MARKING THE
SOUTHERLY TERMINUS OF SAID LAST MENTIONED CURVE, THENCE NORTHWESTERLY ALONG SAID LAST
MENTIONED CURVE, THROUGH SAID DELTA OF 109 DEGREES 20 MINUTES AN ARC DISTANCE OF 61.33
FEET TO THE END OF SAID LAST MENTIONED CURVE, WHICH IS MARKED BY A 2 INCH IRON PIPE,
THENCE ALONG THE NORTHERLY LINE OF SAID LOT, SOUTH 66 DEGREES 01 MINUTES 20 SECONDS WEST
314 72 FEET TO THE TRUE POINT OF BEGINNING THE ABOVE DESCRIBED LAND IS A PORTION OF THE
3.94 AC PARCEL A SHOWN ON A LICENSED SURVEYORS MAP FILED IN BOOK 32 PAGE 14 OF RECORD OF
SURVEYS OF SAID COUNTY

05  3005083

**FIXED/ADJUSTABLE RATE RIDER**
**(1 Year Treasury Index - Rate Caps)**

THIS FIXED/ADJUSTABLE RATE RIDER is made this ___30th___ day of ___November, 2005___, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to ___Washington Mutual Bank, FA___ ("Lender") of the same date and covering the property described in the Security Instrument and located at:

___20544 CHENEY DRIVE, TOPANGA, CA 90290___
(Property Address)

**THE NOTE PROVIDES FOR A CHANGE IN THE BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of ___5.275___ %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:
**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of ___January, 2011___, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."
**(B) The Index**
Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent

4611 (02-01)                    Page 1 of 4

05  3005083

Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two & Sixty-Five-Hundredths                                        percentage points ( 2.650 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than   10.275   % or less than   2.650   %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points (2.0%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than   10.275 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, and any information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid "Principal."

4811 (02-01)                            **Page 2 of 4**



05 3005083

EXHIBIT B

24

## B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in section A above, section 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in section A above, Section 18 of the Security Instrument described in section B1 above shall then cease to be in effect, and the provisions of Section 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be

4611 (02-01)                          Page 3 of 4

05 3005083

impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

X _____

MICHAEL KLOCK

4611 (02-01)                              Page 4 of 4

05 3005083

EXHIBIT B

▲    **This page is part of your document - DO NOT DISCARD**    ▲

**05 3005083**

**RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
12/08/05 AT 08:00am**

# TITLE(S) :

▲    ▲

L E A D    S H E E T

**FEE**                                                              **D.T.T.**

FEE $ 76  F

**CODE
20**        O.A. FEE Code 20        $ 2.00

**CODE
19**

**CODE
9____**

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.    **Number of AIN's Shown**

    **THIS FORM IS NOT TO BE DUPLICATED**    
EXHIBIT B

**NEF:**

1:11-bk-13877-MT Michael R. Klock

Type: bk                         Chapter: 13 v                    Office: 1 (San Fernando Valley)
Assets: y                        Judge: MT

### U.S. Bankruptcy Court

### Central District Of California

Notice of Electronic Filing

The following transaction was received from Josephine E Salmon entered on 5/3/2011 at 10:57 AM PDT and filed on 5/3/2011
**Case Name:**          Michael R. Klock
**Case Number:**        1:11-bk-13877-MT
**Document Number:** 16

**Docket Text:**
Request for courtesy Notice of Electronic Filing (NEF) Filed by Josephine E Salmon on behalf of Courtesy NEF. (Salmon, Josephine)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**Klock NEF.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1106918562 [Date=5/3/2011] [FileNumber=45179582-0
] [801d9172f5c7177e970c7b1bbadab192ba90729be3a22fc73223d3fb56e2fb5d551
fd40b5562df1dca58e92bc3405eefc36807731ad08f675a91ec7d56be5529]]

**1:11-bk-13877-MT Notice will be electronically mailed to:**

Gary L Harre on behalf of Debtor Michael Klock
ghcmecf@gmail.com

Elizabeth (SV) F Rojas (TR)
cacb_ecf_sv@ch13wla.com

Josephine E Salmon on behalf of Interested Party Courtesy NEF
ecfcacbrs@piteduncan.com

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov

Edward T Weber on behalf of Interested Party Courtesy NEF
bknotice@rcolegal.com

**1:11-bk-13877-MT Notice will not be electronically mailed to:**

## U.S. Bankruptcy Court

### Central District Of California

Notice of Electronic Claims Filing

The following transaction was received from Salmon, Josephine on 5/3/2011 at 11:01 AM PDT

**Case Name:**            Michael R. Klock
**Case Number:**          1:11-bk-13877-MT
                          Bank of America, National Association
                          c/o JPMChase Bank National Association
**Creditor Name:**        Attn: OH4-7302
                          3415 Vision Drive
                          Columbus, OH 43219
**Claim Number:**         2    Claims Register
**Total Amount Claimed:** $837107.68

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** Klock POC.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1106918562 [Date=5/3/2011] [FileNumber=45179738-0
] [53971627a7eff2808b3fec3ff5e97a7db71dfe2678f2c840e3424a618f080d50b76
5d5bc45dee2659e318b0befe0c5fc868824011c20a50d2d389e354c1fea10]]

File another claim

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>Michael R. Klock<br><br>Elizabeth (SV) F Rojas (TR) , Chapter13Trustee. | CASE NO.: 1:11-bk-13877-MT |
| | CHAPTER: 13 |
| | **REQUEST FOR COURTESY NOTIFICATION OF ELECTRONIC FILING (NEF)** |

To the Clerk of the U.S. Bankruptcy Court.

I hereby request to receive courtesy electronic notification of all documents filed in the above referenced case. I understand the courtesy electronic notification shall be delivered via the Court's Case Management/Electronic Filing (CM/ECF) system as a Notice of Electronic Filing (NEF), and that I must be a registered user of the Court's CM/ECF system to be eligible for courtesy NEFs.

I further understand this request **DOES NOT** impose any obligation on the Court, the debtors or any other party in the case to deliver courtesy copies of any orders, pleadings or other documents entered on the docket  by mail, telephone, facsimile, or any other means of electronic transmission.

(Please print or type)

NAME:        Josephine E. Salmon SBN (206167)

Law Firm:        Pite Duncan, LLP

Telephone Number: (   858   )   750-7600

Dated:  May 03, 2011            /s/ Josephine E. Salmon
                                                    *Signature*

**NOTE:**  This form can only be filed electronically via the Court's CM/ECF system.  Requests for a courtesy NEF will not be accepted at the Intake window. **Please follow the *Instructions for Requesting a Courtesy Notification of Electronic Filing (NEF)* for the use of this form carefully.**  The instructions are available on the Court's website www.cacb.uscourts.gov under Forms/Rules/General Orders >Court Forms.  You must scan this form to a PDF document, then file it electronically using docket event "Request for Courtesy Notification of Electronic Filing (NEF)."

| UNITED STATES BANKRUPTCY COURT | Central District of California | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor:<br>Michael R. Klock | Case Number:<br>1:11-bk-13877-MT |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br><br>Bank of America, National Association successor by merger to LaSalle Bank NA as trustee for WaMu Mortgage Pass-Through Certificates Series 2007-HY2 Trust | ☐ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|
| Name and address where notices should be sent:<br>JPMChase Bank National Association<br>Attn: OH4-7302<br>3415 Vision Drive<br>Columbus, OH 43219<br><br>Telephone number: | **Court Claim Number:** _____<br>*(If known)*<br><br>Filed on: _____ |
| Name and address where payment should be sent (if different from above):<br>  JPMChase Bank National Association<br>  ATTN: OH4-7133<br>  3415 Vision Drive<br>  Columbus, OH 43219<br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

**1. Amount of Claim as of Date Case Filed:**     $                837,107.68

If all or part of your claim is secured, complete item 4 below; however, if all or part of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☑ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:**   MONEY LOANED
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:**   xxxxxx7364

   **3a. Debtor may have scheduled account as:** _____
   (See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:**  ☑ Real Estate    ☐ Motor Vehicle    ☐ Other
**Describe:**  20544 Cheney Drive, Topanga, California 90290

**Value of Property:**$_____    **Annual Interest Rate** _____%

**Amount of arrearage and other charges as of time case filed included in secured claim,**

**if any:** $    54,211.84    **Basis for perfection:** _____

**Amount of Secured Claim:** $    837,107.68    **Amount Unsecured:** $_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See Instruction 7 and definition of "redacted" on reverse side.*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5)

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| Date:  05/03/11 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>/s/ Josephine E. Salmon SBN (206167)        *Josephine E. Salmon* | **FOR COURT USE ONLY** |
|---|---|---|

| Steven W. Pite *CA/NV/WA* | Josephine E. Salmon | Joseph C. Delmotte *CA* | Parada Kovadi *CA* | Matthew McArthur *NV* |
|---|---|---|---|---|
| David E. McAllister *AZ/CA/HI/OR/UT/WA* | *AK/AZ/CA/NY* | Gabriel Ozel *CA/NY/TX* | Philip Giles *CA* | Chad L. Butler *CA* |
| Casper J. Rankin *CA/OR* | Ellen Cha *CA/MN* | Balpreet K. Thiara *CA* | Catherine T. Vinh *CA* | Alexis M. Bornhoft *CA/NV* |
| Eddie R. Jimenez *CA/NV/TX* | Erin L. Laney *CA* | Eric J. Testan *CA* | Kyle J. Shelton *AZ* | Rachel A. DaPena *AZ/CA* |
| Brian A. Paino *AZ/CA/TX/VA* | Gagen G. Vaideeswaran *CA* | Rachael Whalen *NY/NJ* | Ace C. Van Patten *ID/NV* | Gilbert R. Yabes *CA* |
| Christopher McDermott *CA* | John B. Acierno *CA* | Benjamin Adams *CA* | Tracy D. Fink *TX* | Matthew R. Clark, III *CA* |
| | | Jared Bissell *CA* | Jesse Baker *OR//UT/WA* | Arnold L. Graff *CA/WI* |
| | | | Todd Garan *CA* | Cara Christensen *WA* |

## PROOF OF CLAIM BREAKDOWN SHEET

### IN RE: **KLOCK, MICHAEL R.**
UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO VALLEY DIVISION

CASE NO. 1:11-bk-13877-MT

CREDITOR: Bank of America, National Association successor by merger to LaSalle Bank NA as trustee for WaMu Mortgage Pass-Through Certificates Series 2007-HY2 Trust [1]

Payments

| | |
|---|---|
| 05/10 – 01/11 @ $3,461.72 x 9 | $31,155.48 |
| 02/11 – 03/11 @ $3,683.42 x 2 | $7,366.84 |
| Late Charges | $519.27 |
| Escrow Shortage | $13,353.78 |
| Broker Price Opinion Fee | $110.00 |
| Property Inspections | $56.00 |
| Foreclosure Fees and Costs | $1,350.47 |
| Post-Petition Bankruptcy Attorneys' Fees and Costs[2] | $300.00 |
| Total Arrears | $54,211.84 |

**Outstanding Balance[3]** **$837,107.68**

---

[1] This Proof of Claim shall not constitute a waiver of the within party's right to receive service pursuant to Fed. R. Civ. P. 4, made applicable to this proceeding by Fed. R. Bankr. P. 7004, notwithstanding Pite Duncan, LLP's participation in this proceeding. Moreover, the within party does not authorize Pite Duncan, LLP, either expressly or impliedly through Pite Duncan, LLP's participation in this proceeding, to act as its agent for purposes of service under Fed. R. Bankr. P. 7004.

[2] Please be on notice that these fees include the post-petition preparation and filing of this Proof of Claim; obtaining and reviewing the Chapter 13 Plan; and the preparation, filing and service of a Request for Courtesy Notice to monitor this bankruptcy. These post-petition fees are included in the Proof of Claim so that the subject loan is current upon completion of the Plan. If the Debtor(s) object to these fees being included in the Proof of Claim, please contact Steven Pite at (800) 500-8757 in order to have these fees and costs removed from the Proof of Claim.

[3] The total outstanding balance was calculated as of March 30, 2011 and includes the post-petition bankruptcy attorneys' fees and costs in the amount referenced above.

EXHIBIT C